**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| FLINT RIVERKEEPER, INC.,<br>JERE MICHAEL COX,<br>SHELBY COX MOORE,<br>GRANVILLE CLIFF MOORE, and<br>SEAN P. DRAIME,<br><br>       Plaintiffs,<br><br>    v.<br><br>SOUTHERN MILLS, INC. d/b/a/<br>TENCATE PROTECTIVE FABRICS,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION NO. 16-CV-326**<br><br>**TRIAL BY JURY DEMANDED** |

**VERIFIED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, CIVIL**
**PENALTIES AND ATTORNEYS' FEES AND EXPENSES OF LITIGATION**

**NATURE OF THE CASE**

1. Pursuant to § 505(a)(1) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1), Plaintiffs Flint Riverkeeper, Inc. (on behalf of itself and its members), Jere Michael Cox, Shelby Cox Moore, Granville Cliff Moore, and Sean P. Draime, bring this action against Southern Mills, Inc. d/b/a/ TenCate Protective Fabrics ("TenCate") for violating §§ 301 and 402 of the CWA, 33 U.S.C. §§ 1311 & 1342, through: (1) direct overland dry and wet weather discharges of still polluted industrial wastewater from spray fields of the Land Application System ("LAS") at Plant Ray—a dyeing and finishing plant owned and operated by TenCate in Molena, Upson County, Georgia 30258—onto adjacent Properties owned by Plaintiffs and into adjacent tributaries of the Flint River and wetlands on Plaintiffs' Properties via ditches, seeps, and other discrete conveyances, and (2) discharges of still polluted industrial wastewater from the LAS to groundwater with a direct hydrological connection to adjacent tributaries of the Flint River and

wetlands located on Plaintiffs' Properties.  Plaintiffs bring this action to compel TenCate to cease these unpermitted discharges, or to obtain a permit required by §§ 301 and 402 of the CWA, for direct point source discharges.

2.     Additionally, Plaintiffs Jere Michael Cox, Shelby Cox Moore, Granville Cliff Moore, and Sean P. Draime bring state law claims of trespass, nuisance, negligence, negligence per se, punitive damages, and attorneys' fees and expense of litigation against TenCate arising from discharges of still polluted industrial wastewater, and emissions of noxious chemical odors, from the LAS onto adjacent properties owned by Plaintiffs.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction over this action pursuant to § 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1).

4.     This Court also has jurisdiction over this action under 28 U.S.C. §§ 1331, 1355.

5.     This Court also has jurisdiction over this action under 28 U.S.C. § 1367.

6.     Venue lies in this judicial district under 28 U.S.C. § 1391, because the events and omissions giving rise to Plaintiffs' claims occurred and continue to occur in Upson County, Georgia, in the Middle District of Georgia, Macon Division.

7.     Venue also lies in this judicial district, as provided by § 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the discharges occurred and continue to occur in Upson County, Georgia, in the Middle District of Georgia, Macon Division.

8.     In compliance with § 505(b) of the CWA, 33 U.S.C. § 1365(b), Plaintiffs provided TenCate with notice of the violations alleged herein and of their intent to file suit after sixty days should the violations continue.

9.      Specifically, on April 20, 2016, Plaintiffs mailed TenCate a Notice of Intent to Sue Letter and mailed copies of the Notice Letter to the Director of EPD and the Administrator and Regional Administrator of the U.S. Environmental Protection Agency ("EPA").

10.     Attached and incorporated in their entirety by reference as Exhibit A are copies of the Notice Letter, proof of delivery, and proof of receipt.

11.     In this letter, Plaintiffs also demanded that TenCate abate nuisance and trespasses to their Properties from the LAS.

12.     Despite receiving the Notice Letter, TenCate has refused and failed to cease the violations of the CWA alleged in the Notice Letter.

13.     Despite receiving the demand to abate, TenCate has refused and failed to abate the nuisance and trespasses to Plaintiffs' Properties alleged in the Notice Letter.

14.     The violations of the CWA identified in the Notice Letter are continuing at this time and are reasonably likely to continue in the future.

15.     Neither EPA nor EPD are prosecuting or diligently prosecuting a pending civil or criminal action to redress the alleged violations.

## PARTIES

16.     Plaintiff Flint Riverkeeper, Inc. is a Georgia non-profit corporation formed in 2008 with its principal office located at 211 North Jefferson Street, Suite 8, Albany, Georgia 31701. Gordon Rogers has been Riverkeeper and Executive Director since 2009.

17.     The mission of Flint Riverkeeper is to "restore and preserve the habitat, water quality and flow of the Flint River Watershed for the benefit of the general public, including the Corporation's members, and future generations and dependent wildlife in the Flint River

Watershed" and to "address regional and state land issues which impact southeastern and Georgia river systems." Flint Riverkeeper, Inc., Bylaws Art. II, § 2.

18.     The members of Flint Riverkeeper are individuals, families, and corporations that support the mission of Flint Riverkeeper and pay annual dues.  Bylaws, Art. III.  Flint Riverkeeper holds an annual meeting of the membership "to present reports, and the conduct of other business."  Bylaws, Art. IV.  "Any member who feels aggrieved by a decision of the Board on a matter related to the Corporation's mission may appeal the decision."  Bylaws, Art. V, § 10.

19.     Flint Riverkeeper has more than 635 active members, which include families, businesses, and farms comprising more than 2,500 individuals.  These members use, enjoy, recreate in/on, and work and reside near the Flint River and its tributaries.  These members have recreational, aesthetic, and economic interests in the Flint River and its tributaries.

20.     Flint Riverkeeper monitors pollution and polluters throughout the Flint River Basin watershed through a program of observation, water quality sampling, and responding to citizen complaints.

21.     Plaintiffs Jere Michael Cox, Shelby Cox Moore, and Granville Cliff Moore are members in good standing of the Flint Riverkeeper.

22.     Plaintiffs Jere Michael Cox, Shelby Cox Moore, and Granville Cliff Moore ("Cox Plaintiffs") are relatives whom own contiguous parcels of real property (together approximately 70 acres) and a house, which are located at 7259 Crest Highway, Molena, Upson County, Georgia 30258 (Parcel Nos. 005073 & 005073B).

23.     Plaintiff Shelby Cox Moore also owns and resides at contiguous parcels of real property (together approximately 3.41 acres) and a house, which are located at 7277 Crest

Highway, Molena, Upson County, Georgia 30258 (Parcel Nos. 005073A & 005074) and which are contiguous to Parcel Nos. 005073 & 005073B.

24.    These contiguous parcels of real property described in Paragraphs 22 and 23 ("Cox Property") have been owned by the Cox Plaintiffs and/or their ancestors continuously since 1945.

25.    Portions of Elkins Creek, a tributary of the Flint River, flow through the Cox Property.

26.    Portions of Cox Creek, a tributary of the Flint River, flow through portions of the Cox Property near its southern border.

27.    Cox Creek drains into portions of Elkins Creek on or near the southwestern corner of the Cox Property.

28.    The confluence of Elkins Creek with the Flint River is approximately 1.4 miles from this southwestern corner of the Cox Property.

29.    Plaintiff Sean P. Draime owns and resides at contiguous parcels of real property (together approximately 71.88 acres) and a house, which are located at 1459 Lawrence Road, Molena, Upson County, Georgia 30258 (Parcel Nos. 005006, 005007, and 005080) and which he acquired in 2014 ("Draime Property").

30.    The northwestern border of the Draime Property is the centerline of Hardy Creek, a tributary of the Flint River that drains into Spring Creek.

31.    Defendant Southern Mills, Inc. d/b/a/ TenCate Protective Fabrics is a domestic for-profit corporation with its principal office located at 6501 Mall Boulevard, Union City, Fulton County, Georgia 30291.

32.     The registered agent of Defendant TenCate Protective Fabrics is Mark D. Christman and his physical address is 6501 Mall Boulevard, Union City, Georgia 30291.

33.     Defendant TenCate Protective Fabrics is a division of Royal TenCate (USA), Inc., a foreign for-profit corporation with its principal office located at 365 S. Holland Drive, Pendergrass, Georgia 30567-4625.

34.     Defendant TenCate Protective Fabrics owns an approximately 342.84-acre parcel of real property located at 1683 Lawrence Road, Molena, Upson County, Georgia 30258 (Parcel No. 005005), which it acquired in 1991.

35.     Located on Parcel No. 005005 is a dyeing and finishing plant owned and operated by TenCate Protective Fabrics ("Plant Ray") and certain spray fields ("North Zone" and "South Zone") of a Land Application System used to treat industrial wastewater generated by Plant Ray.

36.     The southeastern border of Parcel No. 005005 is contiguous to the northwestern border of the Draime Property and Hardy Creek.

37.     Defendant TenCate Protective Fabrics also owns an approximately 115.39-acre parcel of real property located at Thundering Springs Road, Molena, Upson County, Georgia 30258 (Parcel No. 005076), which is contiguous to Parcel No. 005005 and which it acquired in 2007.

38.     Located on Parcel No. 005076 is a spray field ("West Zone") of the Land Application System used to treat industrial wastewater generated by Plant Ray.

39.     The northern border of Parcel No. 005076 is contiguous to the southern border of the Cox Property.

40.     Portions of Cox Creek flow through portions of the northern portion of Parcel No. 005076.

41.     From the confluence of Hardy Creek and Spring Creek, Spring Creek flows through Parcel No. 005076 between spray fields and Plant Ray, then flows through Parcel No. 005005 along the western edge of the spray fields on Parcel No. 005005, and then drains into Elkins Creek on or near the southwestern corner of the Cox Property.

## STATUTORY AND REGULATORY FRAMEWORK

**I.     NPDES Permitting Program.**

42.     The objective of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

43.     To achieve this objective, § 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of pollutants" by any person into "waters of the United States."

44.     Section 402 of the CWA, 33 U.S.C. § 1342, establishes the National Pollutant Discharge Elimination System ("NPDES") permitting program, which prohibits the discharge of pollutants from a "point source" into "waters of the United States" without a NPDES permit or in violation of the limitations and conditions of a NPDES permit.  *See also* 33 U.S.C. §§ 1311, 1344.

45.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well [or] discrete fissure . . . from which pollutants are or may be discharged."

46.     The Environmental Protection Agency ("EPA") has authority to issue NPDES permits, however, § 402(b) of the CWA, 33 U.S.C. § 1342(b), provides for the delegation of permitting authority to EPA-approved programs implemented by state agencies.

47.     On June 26, 1974, EPA delegated to EPD the authority to issue NPDES permits in the State of Georgia pursuant to the Georgia Water Quality Control Act ("GWQCA").  O.C.G.A. § 12-5-20 et seq.

48.     The GWQCA requires "any person who owns or operates a facility of any type . . . which results . . . or will result in the discharge of pollutants from a point source into waters of the state shall obtain from the director a [NPDES] permit to make such discharge."  O.C.G.A. § 12-5-30(a).

49.     The purposes of the NPDES permitting program are to maintain state water quality standards and further the objectives of the CWA.

50.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt water quality standards, including narrative criteria and numeric criteria (risk-based criteria that set site-specific allowable pollutant levels for individual state water bodies).  *See* 40 C.F.R. § 131.3(b).

51.     The purpose of water quality standards is to ensure that water quality provides for the protection and propagation of fish, shellfish, and wildlife, and provides for recreation in and on the water.  *See* 33 U.S.C. § 1251(a)(2).

52.     States adopt water quality standards based upon "designated uses of the navigable waters involved" and "taking into consideration their use and value for public water supplies, propagation of fish and wildlife, and recreational purposes," among other uses.  *Id*. at § 1313(c)(2)(A).

53.     On March 15, 2012, EPA approved the most recent EPD revisions to the Georgia Water Quality Standards, Ga. Comp. R. & Regs. 391-3-6.03, which took effect in Georgia on June 5, 2011.  Prior revisions by EPD became effective on February 18, 2009.

54.     From 2009 to the present, Georgia Water Quality Standards set forth specific water quality criteria for each classified water usage.  *See id*. at § 391-3-6.03(6)(c) (criteria for water bodies with a designated use of "fishing").

55.     NPDES permits may include "technology-based" and/or "water quality-based" effluent limitations, monitoring and reporting requirements, special conditions such as pretreatment requirements, and standard conditions.

56.     Section 303 of the CWA, 33 U.S.C. § 1313 and CWA regulations, *see* 40 C.F.R. § 122.44(d), require that NPDES permits incorporate water quality-based effluent limitations for pollutants if technology-based effluent limitations are insufficient to ensure compliance with water quality standards.

57.     Each state-issued NPDES permit must also include requirements necessary to achieve water quality standards, including state narrative water quality criteria.  40 C.F.R. § 122.44(d)(1).

58.     Section 306 of the CWA, 33 U.S.C. § 1316, requires EPA to establish standards of performance for new point source discharges ("New Source Performance Standards" or "NSPS") which reflect "the greatest degree of effluent reduction . . . achievable through application of the best available demonstrated control technology" and which "take into consideration the cost of achieving such effluent reduction."

59.     Under the regulations implementing the GWQCA, owners or operators of any new point source discharge must operate such source in compliance with the NSPS applicable to such source.  Ga. Comp. R. & Regs. § 391-3-6.06(4)(e).

60.     The NSPS for "woven fabric finishing" would be applicable to Plant Ray if it converted disposal of its industrial wastewater from an LAS to direct point source discharge to the Flint River.  40 C.F.R. § 410.45(a).

## II.     Regulation of Land Application Systems under the GWQCA.

61.     Under regulations implementing the GWQCA, EPD issues permits for the operation of Land Application Systems.  Ga. Comp. R. & Regs. § 391-3-6.11.

62.     A "land disposal system" is "any method of disposing of pollutants in which the pollutants are applied to the surface or beneath the surface of a parcel of land and which results in the pollutants percolating, infiltrating, or being absorbed into the soil and then into waters of the State."  Ga. Comp. R. & Regs. § 391-3-6.11(2)(b).

63.     A "land treatment system" or LAS is "any land disposal system in which vegetation on the site is used to remove some of the pollutants applied."  Ga. Comp. R. & Regs. § 391-3-6.11(2)(c).

64.     "Hydraulic loading rate" is the rate at which wastes or wastewater are discharged to a . . .  land treatment system expressed in volume per unit area per unit time or depth of water per unit area per unit."  Ga. Comp. R. & Regs. § 391-3-6.11(2)(g).

65.     LASs are to provide treatment so that pollutants are removed from wastewater by plants and soil before such wastewater enters waters of the United States.  *See* Ga. Dep't of Nat. Res., *Guidelines for Slow-Rate Treatment of Wastewater via Spray Irrigation* (July 2010).

66.     The irrigated industrial wastewater evaporates and transpires to the atmosphere or enters the groundwater through percolation.

67.     Organic constituents in the wastewater are stabilized by soil bacteria.

68.     Organic and ammonia nitrogen are taken up by plants, nitrified by soil bacteria, lost to the atmosphere through denitrification, and leached into the groundwater.

69.     Phosphorus and other constituents are adsorbed in the soil profile and taken up by plants.

70.     Properly designed and operated LASs produce a percolate water of sufficient quality to protect surface and ground water resources.

71.     Improperly designed and operated LASs can result in point source discharges of still polluted industrial wastewater to surface and ground water resources.

72.     The regulations require that "owners of land disposal or land treatment systems which employ overland flow, subsurface drain fields, or other techniques which result in one or more point discharges into surface waters of the State, must obtain an NPDES permit and will not be issued a land disposal permit."  Ga. Comp. R. & Regs. § 391-3-6.11(3).

73.     EPD may terminate a land disposal system permit "in whole . . . during its term for cause, including, but not limited to failure . . . of the permittee to carry out the requirements of the [GWQCA] or regulations promulgated pursuant thereto."  Ga. Comp. R. & Regs. § 391-3-6.11(9)(b).

## III.     Protection of Impaired Waters under the CWA.

74.     Section 303(d) of the CWA, 33 U.S.C. § 1313(d), requires states to promulgate a list of "impaired" waters too polluted or otherwise degraded to meet state water quality standards.

75.     States must establish priority rankings for water bodies on the lists and develop a "total maximum daily load" ("TMDL") for each water body, which is a calculation of the

maximum amount of a pollutant that a water body can receive while meeting water quality standards.

76.    States may then convert the TMDL pollutant amount into a concentration-based waste load allocation for implementation in NPDES permits.

77.    The TMDL program helps the NPDES permitting program further reduce pollution in a water body that does not meet water quality standards by assigning a pollutant load to a water body.

78.    Spring Creek is on Georgia's list of impaired streams, promulgated pursuant to § 303(d) of the CWA, for not supporting its designated use of fishing due to elevated levels of fecal coliform bacteria from "nonpoint sources/unknown sources."

79.    The portion of Elkins Creek that runs through the Cox Property to the Flint River is also on Georgia's list of impaired streams for not supporting its designated use of fishing due to elevated levels of fecal coliform bacteria from "nonpoint sources/unknown sources."

80.    The portion of the Flint River into which Elkins Creek drains is also on Georgia's list of impaired streams for not supporting its designated uses of fishing and drinking water due to pH levels from "nonpoint sources/unknown sources."

**IV.    Citizen Enforcement of the CWA and Civil Penalties.**

81.    Section 505(a) of the CWA, 33 U.S.C. § 1365(a), authorizes "any citizen" to commence a civil action for appropriate relief, including declaratory and injunctive relief and civil penalties, whenever any person is in violation of § 301 of the CWA, 33 U.S.C. § 1311, or violates any limitation or condition in a NPDES permit issued pursuant to § 402 of the CWA, 33 U.S.C. § 1342.

82.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates § 301 of the CWA, 33 U.S.C. § 1311, or violates any limitation or condition in a NPDES permit issued pursuant to § 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty not to exceed $51,570 per day for each violation which takes place after January 12, 2009.  *See* 40 C.F.R. § 19.4.

## FACTUAL BACKGROUND

**I.      TenCate's Land Application System and Permit from EPD.**

83.     In 1987, because of adverse environmental effects of land disposal of industrial wastewater generated by a textile dyeing at a plant owned by Southern Mills, Inc. in Senoia, Coweta County, Georgia, Southern Mills, Inc. sought to relocate its dyeing operations to a proposed plant in Upson County, Georgia.

84.     In 1988, Southern Mills, Inc. submitted to EPD an application to construct and operate a Land Application System Permit on Parcel No. 005005 in connection with construction of a new textile dyeing and finishing plant.

85.     At that time, Parcel No. 005005 was considered by many local citizens to be a beautiful and an excellent recreational area.

86.     The Property owned by TenCate and Plaintiffs is located within the Pine Mountain Range of west-central Georgia a unique mountain chain at the southern border of the Piedmont physio-geographic region of Georgia.

87.     Due to the unique mixture of plant and animal species, the Pine Mountain Range is an area of conservation interest that scientists have proposed be protected due to its ecological and geological uniqueness.

88.     At that time, members of the public submitted comments against issuance of the LAS Permit on the basis that the topography, soils, and hydrology of the site made it very poorly suited for an LAS.

89.     At that time, Southern Mills, Inc. promised to be a "good neighbor" to adjacent and nearby residents and property owners.

90.     On June 16, 1989, EPD issued Land Application Permit No. GAJ010578 to Southern Mills, Inc. for operation of the LAS at Plant Ray.

91.     Citizens that owned and/or resided on real property near Parcel No. 005005 appealed issuance of the Permit.

92.     In 1989, Southern Mills, Inc. constructed the first spray field ("South Zone") on Parcel No. 005005.

93.     In 1991, Southern Mills, Inc. built the textile dyeing and finishing plant ("Plant Ray").

94.     Plant Ray treats the industrial wastewater it generates with a LAS by discharging the industrial wastewater through a series of spray heads onto spray fields.

95.     The average production rate of Plant Ray is 15,000 to 16,000 pounds per day and produces wastes associated with the SIC codes 2262 (dyeing and finishing manmade fiber) and 2221 (manmade fabric mill).

96.     On July 7, 1992, Southern Mills, Inc. entered into a Consent Order with EPD for the discharge of approximately 100,000 to 200,000 gallons of wastewater from the LAS at Plant Ray into Hardy Creek on the Draime Property.

97.     In or around 1993, EPD began receiving complaints from local citizens that the operations of the LAS were generating noxious chemical odors.

98.     In or around 1994, EPD reissued the LAS Permit to Southern Mills, Inc.

99.     On July 30, 1999, EPD reissued the LAS Permit to Southern Mills, Inc.

100.    In 2000, EPD approved construction of the North Zone Spray Field on Parcel No. 005005 and expansion of the South Zone Spray Field.

101.    The South Zone Spray Field, which is up-gradient of and adjacent to Hardy Creek and the Draime Property, is approximately 55 acres.

102.    Spring Creek flows between the South Zone Spray Field and North Zone Spray Field.

103.    A perennial stream originates on the North Zone Spray Field and flows through the spray field into Spring Creek.

104.    At least two other streams originate on the South Zone Spray Field and flow through the spray field into Spring Creek.

105.    On August 13, 2003, Southern Mills, Inc. spilled approximately 2,500 to 4,000 gallons of wastewater from the LAS into Spring Creek.

106.    On July 28, 2004, EPD reissued the LAS Permit to Southern Mills, Inc.

107.    In 2004, Southern Mills, Inc. was acquired by Royal TenCate, N.V., a multinational textile corporation from the Netherlands, through a merger with TenCate Acquisition Corp a domestic for-profit corporation.  The surviving entity is Defendant Southern Mills, Inc. d/b/a/ TenCate Protective Fabrics ("TenCate").

108.    In 2008, Southern Mills, Inc. expanded the LAS at Plant Ray through construction of spray fields on Parcel No. 005076 ("West Zone"), which is contiguous to the Cox Property.

109.    Before this expansion, the waters of Cox Creek, Elkins Creek, and wetlands on the Cox Property ran clear, there were high-quality oak and gum flats on the Cox Property, and

there was abundant wildlife on the Cox Property including beavers, otters, waterfowl, wild turkey, deer, and rare plants and flowers, which Plaintiffs enjoyed watching, hunting, and collecting.

110.    The West Zone Spray Field, which is up-gradient of and adjacent to Cox Creek and the Cox Property, is approximately 45 acres.

111.    The total area of irrigation on the spray fields of the LAS is approximately 116 acres.

112.    Upon information and belief, in or around the time of the expansion, the LAS began generating noxious chemical odors of greater intensity.

113.    Plaintiff Flint Riverkeeper and several of its members including Donald Fowler and Plaintiff Jere Michael Cox have on numerous ocassions submitted complaints to TenCate and EPD regarding these noxious chemical odors.

114.    At times, the emissions of noxious chemical odors from the LAS onto Plaintiffs' Properties are so strong that they make members of Flint Riverkeeper including Plaintiffs physically ill (sometimes while inside their houses), cause their eyes and noses to burn, and prevent them from going outdoors on their Properties.

115.    On December 31, 2008, EPD reissued the LAS Permit to TenCate Protective Fabrics.

116.    In 2012, in response to complaints by Flint Riverkeeper, including Riverkeeper Gordon Rogers and member Donald Fowler, EPD required TenCate to alter spray heads on the LAS because of overspray from the LAS directly into Hardy Creek on the Draime Property.

117.    The Permit allows TenCate to apply 0.5 million gallons per day ("MGD") of industrial wastewater from Plant Ray to the spray fields of the LAS in the Flint River Basin.

118.    In violation of its Permit and the GWQCA, TenCate failed to submit a timely application for reissuance of the Permit, which was to expire on November 30, 2013.

119.    As a result, on November 27, 2013, TenCate entered into a Consent Order with EPD under which it paid a $5,000 fine and which extended the Permit.

120.    Because of significant input from the public during the public hearing/comment period, EPD amended the Consent Order multiple times to extend the Permit.

121.    On December 6, 2013 and August 8, 2014, Flint Riverkeeper and several of its members submitted comments to EPD on the proposed reissuance of the Land Application Permit for operation of the LAS at Plant Ray.

122.    In its comments, Flint Riverkeeper stated that "the most important problem with this LAS is the evidence that TenCate is impermissibly discharging some of its wastewater into public waters and onto neighboring properties."  Flint Riverkeeper urged EPD to move TenCate from an LAS to a "NPDES-permitted direct discharge."

123.    In his comments, Flint Riverkeeper member Donald Fowler described his observations of discharges of still polluted industrial wastewater into Hardy Creek and noxious chemical odors from the LAS and urged EPD to require TenCate to move to a direct stream discharge system for treating its industrial wastewater.

124.    Plaintiff Flint Riverkeeper and several of its members, including Riverkeeper Gordon Rogers, Donald Fowler, and Plaintiff Jere Michael Cox, also made oral comments against reissuance of the Permit at a public hearing held in Thomaston, Upson County, Georgia, on August 5, 2014.

125.    During the public comment period, EPD also received a petition from numerous citizens that own and reside at property near Plant Ray that requested EPD to deny reissuance of

the Permit because of the recent increase in the intensity of noxious chemical odors from the LAS.

126.    In 2013, EPD explored the potential for issuing a NPDES permit for a direct stream discharge of treated industrial wastewater effluent from Plant Ray "because of the complaints against TenCate's LAS."

127.    On January 8, 2014, EPD produced a concentration-based waste load allocation for use in a potential NPDES permit for Plant Ray which recommended Flint River at Elkins Creek, over Spring Creek at Lawrence Road (near Draime Property), Spring Creek at Thundering Springs Road, and Spring Creek at Elkins Creek (near Cox Property), as the location for the proposed discharge, and which recommended specific permit limits based on NSPS for for "woven fabric finishing," *see* 40 C.F.R. § 410.45(a), that EPD contended would be protective of water quality standards applicable to the Flint River.

128.    EPD also noted "there is potential for this facility to reuse some or all of [its] treated effluent for process water."

129.    Instead of requiring TenCate to obtain such an NPDES permit, on September 24, 2014, EPD capitulated to TenCate and reissued Land Application Permit No. GAJ010578 to TenCate Protective Fabrics for operation of the LAS at Plant Ray.

130.    At all relevant times, the Permit stated "No Discharge System: The wastewater and disposal system shall be operated such that there is no direct discharge to surface waters."

131.    At all relevant times, the Permit required TenCate to "notify EPD immediately if mechanical failure, inclement weather, or other factors cause a discharge of contaminated runoff from the fields."

132.     In response to comments submitted on reissuance of the Permit, EPD stated the Permit "does not allow a point source direct discharge to surface waters.  When properly operated, spray from the LAS should not leave the spray field boundaries."

## II.     TenCate's Discharges of Still Polluted Industrial Wastewater from the Spray Fields onto Plaintiffs' Properties, and into Tributaries of the Flint River.

133.     For years, TenCate has represented the LAS at Plant Ray as a "model" and "award winning" LAS to the citizens of the State of Georgia.

134.     However, the LAS is overburdened and oversaturated from excessive hydraulic loading rate and over application of still polluted industrial wastewater to the spray fields.

135.     Spraying industrial wastewater with high levels of sodium onto spray fields causes loss of soil structure and increased runoff.

136.     Elevated levels of salts in streams negatively affects aquatic organisms (stream life).

137.     Measuring conductivity is one method of determing the level of salts in a stream.

138.     In 2014, a consultant for TenCate found problems with the permeability of the soils on the spray fields and found that TenCate may be spraying into swales and draws on and/or adjacent to the LAS.

139.     In response to this audit, TenCate began applying gypsum to the spray fields to increase permeability of the soils on the spray fields.

140.     The LAS Permit required TenCate to submit an evaluation of the application of gypsum to the spray fields.

141.     In June 2015, TenCate submitted the evaluation to EPD, which found that the problems with the permeability of the soils on the spray fields were ongoing.

142.    Plaintiffs have documented, including through water quality sampling, direct overland dry and wet weather discharges of still polluted industrial wastewater from spray fields to Cox Creek and adjacent wetlands via ditches, runnels, seeps, and other discrete conveyances located on or near the Cox Property on numerous dates within the past five years, including but not limited to those dates in the Notice Letter.

143.    Plaintiffs have documented, including through water quality sampling, direct overland dry and wet weather discharges of still polluted industrial wastewater from spray fields to Hardy Creek via ditches, runnels, seeps, and other discrete conveyances located on or near the Draime Property on numerous dates within the past five years, including but not limited to those dates in the Notice Letter.

144.    Plaintiffs have documented including through water quality sampling discharges of still polluted industrial wastewater from spray fields to Cox Creek and Hardy Creek via groundwater with a direct hydrological connection from the spray fields to Cox Creek and Hardy Creek on numerous dates within the past five years, including but not limited to those dates in the Notice Letter.

145.    Based on water quality sampling conducted by Plaintiffs and TenCate, the pollutants in these discharges include, but are not limited to, highly elevated levels of sodium and salts thereof, calcium and salts thereof, potassium and salts thereof, nitrates, and conductivity, as well as elevated levels of total nitrogen, ammonia, total phosphorus, arsenic, chromium, copper, nickel, zinc, magnesium, aluminum, iron, barium, vanadium, and lead, resulting in among other impairments elevated chemical oxygen demand and hardness.

146.    Plaintiffs' water quality sampling suggests that one cause of these discharges is over application of still polluted industrial wastewater with high levels of sodium for many years which has resulted in a loss of soil structure, decreased permeability, and increased runoff.

147.    Based on information and belief, including water quality sampling conducted by TenCate, discharges of still polluted industrial wastewater from spray fields to streams that flow through North Zone Spray Field and through and/or adjacent to the South Zone Spray Fields and Spring Creek via discrete conveyances and groundwater with a direct hydrological connection from the spray fields to these streams and Spring Creek have occurred within the past five years and are ongoing at this time.

148.    Water quality sampling conducted by TenCate within the past five years has demonstrated elevated levels of, inter alia, sodium, nitrate nitrogen, ammonia nitrogen, chlorides, and conductivity in Spring Creek downstream of the LAS as compared to Spring Creek upstream of the LAS.

149.    Since early 2015, expanded water quality sampling conducted by TenCate has demonstrated elevated levels of, inter alia, sodium, nitrate nitrogen, ammonia nitrogen, total nitrogen, chlorides, and conductivity in Hardy Creek and the streams that flow through the North Zone Spray Field and through and/or adjacent to the South Zone Spray Fields.

150.    Since expansion of the LAS in 2008 to the West Zone Spray Field, Plaintiffs have observed grey sludge and algae blooms on the Cox Property, a decline in the oak and gum flats and other vegetation on the Cox Property, and a decline in the presence of beavers, otters, waterfowl, wild turkey, deer, and rare plants on the Cox Property.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(TenCate Discharged and Continues to Discharge Still Polluted Industrial Wastewater from Its Land Application System into Waters of the United States without a NPDES Permit, in Violation of the CWA)**

151.    Plaintiffs incorporate by reference all preceding Paragraphs.

152.    Cox Creek and wetlands on the Cox Property are waters of the United States.

153.    Hardy Creek and wetlands on the Draime Property are waters of the United States.

154.    Streams that flow through North Zone Spray Field and through and/or adjacent to the South Zone Spray Fields are waters of the United States.

155.    The direct overland dry and wet weather discharges of still polluted industrial wastewater from spray fields to Cox Creek and adjacent wetlands via ditches, runnels, seeps, and other discrete conveyances located on or near the Cox Property on numerous dates within the past five years, including but not limited to those dates in the Notice Letter, without an NPDES Permit are violations of §§ 301 and 402 of the Clean Water Act.

156.    The direct overland dry and wet weather discharges of still polluted industrial wastewater from spray fields to Hardy Creek via ditches, runnels, seeps, and other discrete conveyances located on or near the Draime Property on numerous dates within the past five years, including but not limited to those dates in the Notice Letter, without an NPDES Permit are violations of §§ 301 and 402 of the Clean Water Act.

157.    The discharges of still polluted industrial wastewater from spray fields to Cox Creek and Hardy Creek via groundwater with a direct hydrological connection from the spray fields to Cox Creek and Hardy Creek on numerous dates within the past five years, including but

not limited to those dates in the Notice Letter, without an NPDES Permit are violations of §§ 301 and 402 of the Clean Water Act.

158.    The discharges of still polluted industrial wastewater from spray fields to streams that flow through North Zone Spray Field and through and/or adjacent to the South Zone Spray Fields and Spring Creek via discrete conveyances and groundwater with a direct hydrological connection from the spray fields to these streams and Spring Creek that have occurred within the past five years without an NPDES Permit are violations of §§ 301 and 402 of the Clean Water Act.

159.    The pollutants in these discharges include, but are not limited to, highly elevated levels of sodium and salts thereof, calcium and salts thereof, potassium and salts thereof, nitrates, and conductivity, as well as elevated levels of total nitrogen, ammonia, total phosphorus, arsenic, chromium, copper, nickel, zinc, magnesium, aluminum, iron, barium, vanadium, and lead, resulting in, among other impairments, elevated chemical oxygen demand and hardness.

160.    Based on information and belief, all of the unpermitted discharges alleged above at this time are continuous or intermittent and/or have the potential to reoccur.

161.    These violations of the CWA have forced Plaintiff Flint Riverkeeper, Inc. to divert significant resources over several years from other programs to a program of observation, water quality sampling, responding to citizen complaints, and administrative commenting regarding the LAS at Plant Ray.  *See* Ex. B, Decl. of G. Rogers (Sep. 23, 2016) (incorporated in its entirety by reference).

162.    These violations of the CWA have also injured the aesthetic, recreational, and economic interests of the members of Flint Riverkeeper and Plaintiffs.

23

163.     Plaintiffs attach and incorporate in their entirety by reference Declarations of Riverkeeper Gordon Rogers, Riverkeeper member Donald Fowler, and Riverkeeper members and Plaintiffs Jere Michael Cox, Shelby Cox Moore, Granville Cliff Moore, and Sean P. Draime.

164.     Plaintiffs are entitled to an award of federal civil penalties against TenCate, pursuant to § 505(a) of the CWA, 33 U.S.C. § 1365(a), of up to $51,570 per day for each day of each violation of the CWA and its implementing regulations including all days of each violation that involve the discharge of still polluted industrial wastewater onto Plaintiffs' Properties and into waters of the United States;

165.     Plaintiffs are entitled to a permanent injunction, pursuant to § 505(a) of the CWA, 33 U.S.C. § 1365(a), ordering TenCate to immediately take all necessary steps to come into permanent, consistent compliance with the CWA.

166.     Such an injunction would likely redress the programmatic, aesthetic, recreational, and economic injuries of Plaintiffs and members of Plaintiff Flint Riverkeeper.

167.     Plaintiffs are entitled to an award, pursuant to § 505(d) of the CWA, 33 U.S.C. § 1365(d), of their costs in bringing this action, including reasonable attorneys' fees and expenses of litigation.

## SECOND CLAIM FOR RELIEF
### (Trespass)

168.     Plaintiffs incorporate by reference all preceding Paragraphs.

169.     The discharges of still polluted industrial wastewater from the spray fields of the LAS onto adjacent Properties owned by Plaintiffs and into tributaries and wetlands of the Flint River located on Plaintiffs' Properties adulterated and polluted these waters within the meaning of O.C.G.A. § 44-8-1 and 51-9-7.

170.    This adulteration and pollution of these tributaries and wetlands on Plaintiffs' Properties have lessened the value of these waters to Plaintiffs and has interfered with their use and enjoyment of these waters by Plaintiffs.

171.    The discharges of still polluted industrial wastewater from the spray fields of the LAS onto adjacent Properties owned by Plaintiffs and into tributaries and wetlands of the Flint River located on Plaintiffs' Properties are trespasses.

172.    Plaintiffs are entitled to recover damages for both the lessening of the value and the interference with the use and enjoyment of the tributaries and wetlands on their Properties in an amount to be determined at trial by the enlightened conscience of a jury.

173.    Plaintiffs are entitled to recover damages equal to the cost to repair damage to Plaintiffs' Properties from the discharges of still polluted industrial wastewater from the LAS onto their Properties and any additional diminution in value to their Properties.

174.    Plaintiffs are entitled to recover the thousands of dollars that they have spent to date evaluating the damage to their Properties caused by the discharges of still polluted industrial wastewater from the LAS onto their Properties.

175.    Plaintiffs are without an adequate remedy at law and are entitled to an injunction against TenCate under such terms that will abate the discharges of still polluted industrial wastewater from the LAS onto their Properties.

**THIRD CLAIM FOR RELIEF**
**(Nuisance)**

176.    Plaintiffs incorporate by reference all preceding Paragraphs.

177.    The discharges of still polluted industrial wastewater from the spray fields of the LAS onto adjacent Properties owned by Plaintiffs and into tributaries and wetlands of the Flint River located on Plaintiffs' Properties has damaged the value of Plaintiffs' Properties and

substantially and unreasonably interfered and continues to interfere with Plaintiffs' use and enjoyment of their Properties and has caused and continues to cause them great discomfort, loss of peace of mind, unhappiness, and annoyance.

178.   The emission of noxious chemical odors from the LAS at Plant Ray onto Plaintiffs' Properties damaged the value of Plaintiffs' Properties and substantially and unreasonably interfered and interfere with Plaintiffs' use and enjoyment of their Properties and caused and causes them great discomfort, loss of peace of mind, unhappiness, and annoyance.

179.   The discharges of still polluted industrial wastewater, and emission of noxious chemical odors, from the LAS onto Plaintiffs' Properties are the result of inter alia excessive hydraulic loading rate and over application of still polluted industrial wastewater to the spray fields and not some substantial and relatively enduring feature of the plan of construction or from an essential method of operation.

180.   Plaintiffs are entitled to recover damages for the interference with their use and enjoyment of their Properties and discomfort and annoyance in an amount determined at trial by the enlightened conscience of a jury.

181.   Plaintiffs are entitled to recover damages equal to the cost to repair damage to Plaintiffs' Properties from the discharges of still polluted industrial wastewater, and emissions of noxious chemical odors, from the LAS onto their Properties and any additional diminution in value to their Properties.

182.   Plaintiffs are entitled to recover the thousands of dollars that they have spent to date evaluating the damage to their Properties caused by the discharges of still polluted industrial wastewater, and emissions of noxious chemical odors, from the LAS onto their Properties.

183.    Plaintiffs are without an adequate remedy at law and are entitled to an injunction against TenCate under such terms that will abate the discharges of still polluted industrial wastewater, and emission of noxious chemical odors, from the LAS onto their Properties.

### FOURTH CLAIM FOR RELIEF
### (Negligence)

184.    Plaintiffs incorporate by reference all preceding Paragraphs.

185.    TenCate had a duty to operate the LAS and Plant Ray with a degree of care which is exercised by ordinary prudent persons under the same or similar circumstances and which every prudent man take of his own property of a similar nature.  O.C.G.A. § 51-1-2.

186.    TenCate had a duty to ensure that proper and effective engineering practices were used in the operation of the LAS and Plant Ray to guard against the risk of damage to Plaintiffs' Properties.

187.    TenCate had a duty to operate the LAS and Plant Ray in a manner that would not adulterate and pollute the tributaries of the Flint River on Plaintiffs' Property.

188.    TenCate breached these duties owed to Plaintiffs.

189.    The breach of these duties owed to Plaintiffs were direct and proximate causes of damage to Plaintiffs' Properties and Plaintiffs in amounts to be proven at trial.

### FIFTH CLAIM FOR RELIEF
### (Negligence Per Se)

190.    Plaintiffs incorporate by reference all preceding Paragraphs.

191.    The discharges of still polluted industrial wastewater from the spray fields of the LAS onto adjacent Properties owned by Plaintiffs and into tributaries and wetlands of the Flint River located on Plaintiffs' Properties adulterated and polluted these waters within the meaning of O.C.G.A. § 44-8-1 and 51-9-7.

192.    TenCate's discharges of still polluted industrial wastewater from spray fields of the LAS onto adjacent Properties owned by Plaintiffs and into adjacent waters of the United States located on Plaintiffs' Properties via discrete conveyances and to groundwater with a direct hydrological connection to adjacent tributaries of the Flint River and wetlands located on Plaintiffs' Properties violated the federal Clean Water Act, the Georgia Water Quality Control Act, and the LAS Permit.

193.    TenCate's excessive hydraulic loading rate and over application of still polluted industrial wastewater to the spray fields of the LAS, which overburdened and oversaturated the LAS, resulted in violations of its LAS Permit and the Georgia Water Quality Control Act.

194.    Plaintiffs fall within the scope of persons these statutes and regulations are intended to protect.

195.    Through these violations, TenCate breached duties owed to Plaintiffs and members of the public.

196.    The violations proximately caused damage to Plaintiffs and their Properties in amounts to be proven at trial.

197.    The damage to Plaintiffs and their Properties are the same that the statute was intended to guard against.

### SIXTH CLAIM FOR RELIEF
**(Demand for Attorneys' Fees and Expenses of Litigation under O.C.G.A. § 13-6-11)**

198.    Plaintiffs incorporate by reference all preceding Paragraphs.

199.    Throughout the course of events and actions underlying this action, TenCate has acted in bad faith, been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense and Plaintiffs are entitled to recover as damages from TenCate all expenses of litigation, including attorneys' fees, under O.C.G.A. § 13-6-11.

## SEVENTH CLAIM FOR RELIEF
### (Demand for Punitive Damages)

200.    Plaintiffs incorporate by reference all preceding Paragraphs.

201.    TenCate has stated that its "desire is to always be the best neighbor possible."

202.    TenCate's actions underlying this action, however, show willful misconduct, malice, wantonness, oppression, and an entire want of care which raises a presumption of conscious indifference to consequences.

203.    As such, Plaintiffs are entitled to punitive damages pursuant to O.C.G.A. § 51-12-5.1.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief from this Honorable Court:

A.    A trial by jury on all claims for relief;

B.    A judgment in favor of Plaintiffs on all of Plaintiffs' Clean Water Act claims;

C.    A judgment in favor of Plaintiffs and against TenCate on all of Plaintiffs' state law claims, including their claims for damages, attorneys' fees and expenses of litigation, and punitive damages;

D.    An award of federal civil penalties against TenCate, pursuant to § 505(a) of the CWA, 33 U.S.C. § 1365(a), of up to $51,570 per day for each day of each violation of the CWA and its implementing regulations including all days of each violation that involve the discharge of still polluted industrial wastewater onto Plaintiffs' Properties and into waters of the United States;

E.    A permanent injunction, pursuant to § 505(a) of the CWA, 33 U.S.C. § 1365(a), ordering TenCate to immediately take all necessary steps to come into permanent, consistent compliance with the CWA and to immediately cease all discharges of still polluted industrial

wastewater from the LAS onto Plaintiffs' Properties and into Cox Creek, Hardy Creek, and other waters of the United States, or obtain a permit required by §§ 301 and 402 of the CWA, for direct point source discharges;

F.      A permanent injunction ordering TenCate to immediately change practices and conditions at its LAS and Plant Ray to cease violations of the CWA and its implementing regulations;

G.      A permanent injunction ordering TenCate to design and install adequate control technology to abate the continuing discharge of still polluted industrial wastewater from its LAS onto Plaintiffs' Properties and into Cox Creek, Hardy Creek, and other waters of the United States.

H.      A permanent injunction ordering TenCate to restore the physical, biological, and ecological integrity of Cox Creek, Hardy Creek, other waters of the United States adversely impacted by TenCate's violations of the CWA;

I.      An order that the Court shall maintain jurisdiction over this action until TenCate comes into permanent, consistent compliance with the CWA and complies with every order of this Court in this action, including any judicial consent decree approved by this Court;

J.      An award to Plaintiffs, pursuant to § 505(d) of the CWA, 33 U.S.C. § 1365(d), of their costs in bringing this action, including reasonable attorneys' fees and expenses of litigation; and

K.      A grant of such other relief as the Court deems just and equitable.

Respectfully submitted,

Date: **September 30, 2016**

**s/ R. Hutton Brown**
R. Hutton Brown
Georgia Bar No. 089280
GREENLAW
104 Marietta Street, Suite 430
Atlanta, Georgia 30303
Telephone: (404) 659-3122
Facsimile: (404) 522-5290
E-mail: hbrown@greenlaw.org

*Counsel for Plaintiff Flint Riverkeeper, Inc.*

Date: **September 30, 2016**

**s/ Tyler J. Sniff**
Donald D.J. Stack
Georgia Bar No. 673735
Tyler J. Sniff
Georgia Bar No. 403125
STACK & ASSOCIATES, P.C.
260 Peachtree Street, Suite 1200
Atlanta, Georgia 30303
Telephone: (404) 525-9205
Facsimile: (404) 522-0275
E-mail: dstack@stack-envirolaw.com
tsniff@stack-envirolaw.com

*Counsel for Plaintiffs Flint Riverkeeper, Inc., Jere Michael Cox, Shelby Cox Moore, Granville Cliff Moore, and Sean P. Draime*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

FLINT RIVERKEEPER, INC., et al.,      )
                                      )
          Plaintiffs,                 )
                                      )
     v.                               )     CIVIL ACTION NO.: 16-CV-326
                                      )
SOUTHERN MILLS, INC. d/b/a            )
TENCATE PROTECTIVE FABRICS,           )
                                      )
          Defendant.                  )
                                      )

## VERIFICATION OF JERE MICHAEL COX

STATE OF GEORGIA      )
                      )
COUNTY OF UPSON       )

      Personally appeared before me an officer duly authorized by law to administer oaths JERE

MICHAEL COX, who states under oath that he is a Plaintiff named in the above and foregoing

Complaint and that the facts contained within said Complaint are true to the best of his knowledge

and belief.

      FURTHER AFFIANT SAYETH NOT

_____
JERE MICHAEL COX

Sworn to and subscribed before me this 30 day of September, 2016.

[Affix Seal]

_____
Notary Public
My commission expires: 9-9-19